1  EDWARD R. REINES (Bar No. 135960)
   edward.reines@weil.com
2  DEREK C. WALTER (Bar No. 246322)
   derek.walter@weil.com
3  WEIL, GOTSHAL & MANGES LLP
   201 Redwood Shores Parkway
4  Redwood Shores, CA  94065
   Telephone:  (650) 802-3000
5  Facsimile:  (650) 802-3100
6
7  Attorneys for Plaintiffs/Counterclaim-Defendants,
   ILLUMINA, INC. and SEQUENOM, INC.
8
9                      UNITED STATES DISTRICT COURT
10                   NORTHERN DISTRICT OF CALIFORNIA
11                        SAN FRANCISCO DIVISION
12
13  ILLUMINA, INC. and SEQUENOM, INC.,          Case No. 3:18-cv-02847-SI
14           Plaintiffs/Counterclaim-           PLAINTIFFS/COUNTERCLAIM-
                 Defendants                     DEFENDANTS ILLUMINA, INC. AND
15                                              SEQUENOM, INC.'S RESPONSE TO
             vs.                                DEFENDANTS/COUNTERCLAIM-
16                                              PLAINTIFFS ARIOSA DIAGNOSTICS,
   ARIOSA DIAGNOSTICS, INC., ROCHE             INC., ROCHE MOLECULAR SYSTEMS,
17  SEQUENCING SOLUTIONS, INC. and             INC. AND ROCHE SEQUENCING
   ROCHE MOLECULAR SYSTEMS, INC.              SOLUTIONS, INC.'S MOTION FOR
18                                              SUMMARY JUDGMENT
             Defendant/Counterclaim-
19               Plaintiffs                     PUBLIC REDACTED VERSION
20
                                                Date:  12/21/2018
21                                              Time:  10:00 AM
                                                Courtroom:  1, 17th Floor
22                                              Judge:  Susan Illston
23                                              JURY TRIAL DEMANDED
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................1

II.  LEGAL STANDARDS .........................................................................................3

    A.   LEGAL STANDARD FOR SUBJECT MATTER ELIGIBILITY ...............3

    B.   MOTION FOR SUMMARY JUDGMENT STANDARD............................4

III. OVERVIEW OF THE '751 AND '931 PATENTS .................................................5

IV.  ARGUMENT .........................................................................................................7

    A.   THE CLAIMED INVENTION IS NOT DIRECTED TO A NATURAL PHENOMENON..................................................................................................7

        1.   The Claims Are Directed To A Laboratory Method For Preparing New And Useful DNA Fractions That Do Not Exist In Nature, Not A Natural Phenomenon......................................................................................8

        2.   Defendants' Contentions That The Claims Are Directed To A Natural Phenomenon Are Legally And Factually Erroneous .........................................9

    B.   DEFENDANTS CANNOT SHOW THAT THERE IS NO DISPUTED ISSUE OF FACT UNDER *ALICE* STEP TWO ...................................................15

        1.   Defendants' Deconstructive Approach Fails As A Matter Of Law.................16

        2.   Defendants Have Not Shown That The Claimed Combination Of Steps Is Routine, Conventional, Or Well-Known ..........................................................18

V.   CONCLUSION.....................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*23andme, Inc. v. Ancestry.com DNA, LLC*,
  Case No. 18-cv-02791 (N.D. Cal. Aug. 23, 2018), ECF No. 51 ....................................13

*Aatrix Software v. Green Shades Software*,
  882 F.3d 1121 (Fed. Cir. 2018)...........................................................................4, 17

*Alice Corp. Pty. v. CLS Bank Int'l*
  134 S. Ct. 2347 (2014)...................................................................................passim

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
  841 F. 3d 1288 (Fed. Cir. 2016)..................................................................................18

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)......................................................................................................4

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
  19 F.Supp.3d 938 (N.D. Cal 2013), *aff'd*, 788 F.3d 1371 (Fed. Cir. 2015)....................4

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
  788 F.3d 1371 (Fed. Cir. 2015).....................................................................................13

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
  569 U.S. 576 (2013).....................................................................................................10

*Ass'n for Molecular Pathology v. Myriad*,
  133 S. Ct. 2107 (2013).................................................................................................12

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016)........................................................................4, 17, 18

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018).....................................................................................17

*DDR Holdings, LLC v. Hotels.com*, L.P.,
  773 F.3d 1245 (Fed. Cir. 2014).....................................................................................16

*Diamond v. Diehr*,
  450 US 175 (1981).......................................................................................................12

*Genetic Techs., Ltd. v. Merial L.L.C.*,
  818 F.3d 1369 (Fed. Cir. 2016).....................................................................................13

*Intellectual Ventures I LLC v. Symantec Corp.*,
  838 F.3d 1307, 1313 (Fed. Cir. 2016)............................................................................4

*Internet Patents Corp. v. Active Network, Inc.*,
  790 F.3d 1343 (Fed. Cir. 2015).......................................................................................4

*KSR Intern. Co. v. Teleflex Inc.*,
  550 US 398 (2007).......................................................................................................17

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
  566 U.S. 66 S. Ct. 1289 (2012)................................................................................4, 17

1
*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
   837 F.3d 1299 (Fed. Cir. 2016)........................................................................17
2
*Rapid Litigation Management Ltd. v. CellzDirect Inc.*,
3    827 F. 3d 1042 (Fed. Cir. 2016)...............................................................passim
4
*Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd.*,
   887 F.3d 1117 (Fed. Cir. 2018)........................................................................10
5
STATUTES
6
35 U.S.C. § 101...........................................................................................passim
7
35 U.S.C. § 103.....................................................................................................17
8
Fed. R. Civ. P. 56(a) ............................................................................................4

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Plaintiffs/Counterclaim-Defendants Illumina, Inc. ("Illumina") and Sequenom, Inc.
2   ("Sequenom") (collectively "Plaintiffs"), through their undersigned counsel, hereby oppose
3   defendants/counterclaim-plaintiffs Ariosa Diagnostics, Inc. ("Ariosa"), Roche Molecular Systems, Inc.
4   ("RMS") and Roche Sequencing Solutions, Inc. ("RSS") (collectively "Defendants") motion for
5   summary judgment that claims 1, 2, 4, 5, and 9-10 of U.S. Patent No. 9,580,751 (the "'751 patent")
6   and claims 1-2 and 10-14 of U.S. Patent No. 9,738,931 (the "'931 patent") are invalid and
7   unenforceable because they are not drawn to patent-eligible subject matter under 35 U.S.C. § 101.  *See*
8   Dkt. No. 48

9   **I.      INTRODUCTION**

10  The '751 and '931 patents cover a laboratory technique for preparing a new and useful
11  composition of cell-free DNA that is enriched for fetal DNA.  The technique exploits the inventors'
12  discovery that in a sample of cell-free DNA from a pregnant woman, the DNA that arises from the
13  fetus is smaller on average than the DNA that arises from the mother.  The inventors did not, however,
14  simply claim this natural phenomenon or a naturally-existing composition of DNA.  Rather, the
15  inventors claimed a specific process applying this principle in their own inventive way with discrete
16  laboratory steps, including DNA extraction, size separation, removal of DNA above a certain size, and
17  analysis of the resulting DNA fraction.  By removing the DNA above a particular size selected based
18  on their human ingenuity, the inventors recognized that one can enrich for fetal DNA, and hence test
19  for fetal genetic aberrations with improved signal-to-noise ratio.

20  For proof of the importance of this approach, one need look no further than Defendants' own
21  internal documents, which show ████████████████████████████████████████████
22  ████████████████████████████████████████████████████████████████████████████
23  ████████████████████████████████████████████████████████████████████████████
24  ████████████████████████████████

25
26
27
28

---

PLS.' RESPONSE TO DEFS.' MSJ                                    CASE NO.: 3:18-cv-02847-SI

1

2

3

4

5

6

7

8

9

10

11    Ex. 1.

12          To try to deflect from their application of the patented approach, Defendants contend that they

13    are entitled to summary judgment that the claimed inventions are not eligible for patenting under 35

14    U.S.C. § 101.   Despite the fact that the claimed methods require multiple discrete laboratory

15    components, and human ingenuity in how to design such an approach, Defendants contend that the

16    claims are directed to nothing more than a natural phenomenon. Defendants' arguments—presented at

17    the earliest stage of this case and unsupported by expert or fact witness testimony—are without merit.

18          This is not the first time the eligibility under § 101 of the '751 and '931 patents has been

19    scrutinized.   During prosecution, the Examiner considered patent eligibility at length in light of recent

20    Federal Circuit case law and in view of expert witness testimony.   After thoroughly considering the

21    law and evidence, the Examiner concluded that the claims were eligible for patenting, finding that "the

22    application of the ***practical steps of the claimed methods to the particular sample required of the***

23    ***claimed methods was not routine and conventional in the art***."   Ex. 2 [6/2/2017 NOA].   Defendants

24    present nothing to justify upsetting the Examiner's conclusions.

25          Defendants' arguments are based on several legal and factual errors that fail to justify

26    overturning the Examiner's findings and granting summary judgment.   Defendants ignore and

27    oversimplify the claim language to force analogy with inapposite cases.   Defendants also ignore that

28    the claimed process results in a composition of DNA that is enhanced for fetal DNA that does ***not***

occur in nature.  Likewise, Defendants ignore that the claims are agnostic to the fact that fetal cell-free DNA is smaller than maternal DNA, such that they cannot possibly be directed to merely observing this phenomenon.  When the claim language is fairly considered, the differences between this case and the cases relied upon by Defendants are apparent.  Those cases involve claims that broadly preempted natural phenomena by expressly claiming little more than "detecting" the natural phenomenon.  When all is said and done, the claims in this case are just like the claims that the Federal Circuit found to be patent eligible in *Rapid Litigation Management Ltd. v. CellzDirect Inc.*, 827 F. 3d 1042 (Fed. Cir. 2016), a case that Defendants fail to distinguish meaningfully.

As to the numerous discrete laboratory steps in the claims that are non-natural and confer eligibility, Defendants try to dismiss them by arguing that they do not individually create "novelty." But, even assuming an individual claim step is conventional, the claim steps as a whole recite a process that was not routine or conventional, as the Examiner confirmed during prosecution.  Virtually every patented method is made up of a series of known steps.  Analyzing the claims as a whole is what matters for patent eligibility.  Defendants, however, present nothing on this issue except thin attorney argument.  In fact, the available evidence—including the testimony of Defendants' own 30(b)(6) witness—shows that the claimed processes are not well-understood, routine, or conventional and that the claims include an inventive concept.

For these and other reasons, Defendants have fallen far short of meeting their heavy burden of showing that there is no genuine issue of fact as to the eligibility for patenting of the claims of the '751 and '931 patents.  Quite the contrary, the facts and law firmly establish that the '751 and '931 patents satisfy § 101.

## II.	LEGAL STANDARDS

### A.	Legal Standard For Subject Matter Eligibility

The Supreme Court in *Alice Corp. Pty. v. CLS Bank Int'l* has established a two-step framework to determine patent subject matter eligibility under 35 U.S.C. § 101.  *See* 134 S. Ct. 2347, 2355 (2014).

At *Alice* step one, a court must determine whether the claimed invention is "directed to" ineligible subject matter.  *Id.* at 2354-55.  This step requires a court to consider the claims "in their entirety to ascertain whether their character ***as a whole*** is directed to excluded subject matter." *Internet*

*Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015).[1]  In making this determination, courts have cautioned that "too broad an interpretation of th[e] exclusionary principle could eviscerate patent law," and that courts should tread carefully on this point because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."  *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 19 F.Supp.3d 938, 943–44 (N.D. Cal 2013), *aff'd*, 788 F.3d 1371 (Fed. Cir. 2015) (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71, 132 S. Ct. 1289, 1293 (2012)).

At *Alice* step two, a court must "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application."  *Alice*, 134 S. Ct. at 2357.  "Step two is 'a search for an inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.'"  *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016).  "The 'inventive concept' may arise in one or more of the individual claim limitations or in the ordered combination of the limitations" and "requires more than recognizing that each claim element, by itself, was known in the art."  *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349-1350 (Fed. Cir. 2016).   "Whether the claim elements or the claimed combination are well-understood, routine, conventional is a question of fact."  *Aatrix Software v. Green Shades Software*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).

### B.    Motion For Summary Judgment Standard

Summary judgment is only proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences

---

[1] Emphasis supplied unless otherwise noted.

1  from the facts are jury functions, not those of a judge…ruling on a motion for summary judgment….”

2  *Id.*

3  **III.    OVERVIEW OF THE '751 AND '931 PATENTS**

4          As set forth in the '751 and '931 patents, the inventors discovered that in a maternal cell-free

5  DNA sample from a pregnant woman the fetal DNA is on average smaller than the maternal DNA.

6  *See, e.g.*, Dkt. No. 48-2 ['751 patent] at 1:54-58 ("An examination of circulatory extracellular fetal

7  DNA and circulatory extracellular maternal DNA in maternal plasma has now shown that,

8  surprisingly, the majority of the circulatory extracellular fetal DNA has a relatively small size of

9  approximately 500 base pairs or less….").

10         In their patent claims, the inventors presented a novel process that exploits this discovery to

11  create a non-natural composition of DNA that is enhanced for fetal DNA.  As set forth in the patent,

12  this composition of DNA presented new and useful utility because it allowed for improved detection of

13  fetal genetic traits, such as aneuploidy, via analysis of a cell-free DNA sample taken from a pregnant

14  woman:

15         This selective enrichment, which is based on size discrimination of circulatory DNA
           fragments of approximately 500 base pairs or less, leads to a fraction which is largely
16         constituted by fetal extracellular DNA.  This permits the analysis of fetal genetic traits
           including those involved in chromosomal aberrations (e.g. aneuploidies or
17         chromosomal aberrations associated with Down's syndrome) or hereditary Mendelian
           genetic disorders and, respectively, genetic markers associated therewith (e.g. single
18         gene disorders such as cystic fibrosis or the hemoglobinopathies), the determination of
           which had, as mentioned above, so far proved difficult, if not impossible. Size
19         separation of extracellular fetal DNA in the maternal circulation thus facilitates the non-
           invasive detection of fetal genetic traits, including paternally inherited polymorphisms
20         which permit paternity testing
21

22  *Id.* at 2:7-22.  This is further made clear, for instance, in claim 1 of the '751 patent, which states that it

23  is directed to a "method for preparing a deoxyribonucleic acid (DNA) fraction from a pregnant human

24  female useful for analyzing a genetic locus involved in a fetal chromosomal aberration…."  *Id.* at claim

25  1.

26         Example 2 of the patents describe one such experiment where the technique enabled enhanced

27  detection capabilities.  There, the inventors described an experiment for detecting particular genetic

28  markers on chromosome 21 called "short tandem repeats" or "STRs" that consist of short repeated

sequences of DNA.  As the experiment showed, the fetal STRs were detectable only when the claimed size selection process was applied.  *See id.* at 6:34-37 ("Only in the size-separated fractions ( <300 bp and 300-500 bp) could the fetal alleles for D21Sll be detected, namely the paternally inherited 228 bp allele and the maternally inherited 232 bp allele, i.e., one allele from each parent.").  The patent went on to explain that this can allow for detection of abnormal karyotypes (*i.e.*, aneuploidies).  *See id.* at 6:38-43 ("Analysis of the STR fragments can allow for the detection of paternal alleles that are distinct in length from the maternal repeat sequences, and by calculating the ratios between the peak areas it can be possible to identify patterns that are not consistent with a normal fetal karyotype.").

The claims of the patents-in-suit include four general steps.  First, there is a step that requires extracting DNA from the cell-free blood sample.  Second, there is a step that requires applying a size discrimination process.  Third, there is a step that requires removing DNA above a particular size based on a practical parameter regarding the target size ranges that is the product of human ingenuity and scientific judgment.  In the '751 patent this parameter is 500 base pairs, whereas in the '931 patent it is 300 base pairs.  These size parameters are not some sort of natural law such as $\pi$ or the boiling point of water.  They are also not universal parameters dictated by the distribution of DNA sizes. Rather, they are human-selected parameters based on the context of the particular types of analyses that are carried out, such as the analyses in the patent for detection of STR markers on chromosome 21. *See id.* at 6:34-41.  Finally, there is a step directed to analyzing the resulting DNA compositions that are enriched for fetal DNA.  In the '751 patent, this step requires analyzing a particular genetic locus, while in the '931 patent the claims recite analyzing the DNA fragments that result from the size selection.

Representative claim 1 of the '751 patent is reproduced below, and illustrates the steps summarized above.

> **1.** A method for preparing a deoxyribonucleic acid (DNA) fraction from a pregnant human female useful for analyzing a genetic locus involved in a fetal chromosomal aberration, comprising:
>
> (a) extracting DNA from a substantially cell-free sample of blood plasma or blood serum of a pregnant human female to obtain extracellular circulatory fetal and maternal DNA fragments;
>
> (b) producing a fraction of the DNA extracted in (a) by:

1

2

3

4

5

> > (i) size discrimination of extracellular circulatory DNA fragments, and
> >
> > (ii) selectively removing the DNA fragments greater than approximately 500 base pairs, wherein the DNA fraction after (b) comprises a plurality of genetic loci of the extracellular circulatory fetal and maternal DNA; and
> >
> > (c) analyzing a genetic locus in the fraction of DNA produced in (b).

6

7

8

9

10

11

*Id.* at claim 1.  Notably, nothing in this claim is directed to observing or detecting that fetal cell-free DNA is smaller than maternal cell-free DNA.  The processes set forth in the claims do not provide the relative size distribution between fetal and maternal cell-free DNA.  It was the inventors' specific experiments quantifying SRY and GADPH gene fragments that allowed them to determine that, in fact, fetal cell-free DNA is on average smaller than maternal cell-free DNA.  *See generally id.* at 4:13-59.

12

13

Dependent claims include several additional laboratory steps that do not occur in nature, and cannot be shrugged off in the analysis, including at least the following:

14

15

16

17

18

19

20

21

22

- The use of amplification, including PCR and ligase chain reaction ('751 patent claims 4-6).

- The use of chromatography, including high performance liquid chromatography ('931 patent claims 4-5).

- The use of electrophoresis, including capillary electrophoresis ('931 patent claims 6-7).

- The use of centrifugation, including density gradient centrifugation ('751 patent claims 7-8; '931 patent claims 8-9).

- The use of nucleic acid arrays ('931 patent claim 11).

- The detection of aneuploidy, including Down's syndrome ('751 patent claims 9-10; '931 patent claims 13-14).

23

## IV.   ARGUMENT

24

### A.   The Claimed Invention Is Not Directed To A Natural Phenomenon

25

26

27

28

In conducting the analysis under *Alice* step one, "it is not enough to merely identify a patent-ineligible concept underlying the claim."  *CellzDirect*, 827 F.3d at 1050.  Courts "must determine whether that patent-ineligible concept is what the claim is '***directed to***.'"  *Id.*  As documented below, binding Federal Circuit precedent establishes that the claims are not directed to a natural phenomenon,

but rather a patent-eligible process for creating a new and useful DNA composition.   Far from overcoming this authority, Defendants ignore and oversimplify the claim language and rely on inapplicable cases.

> **1.    The Claims Are Directed To A Laboratory Method For Preparing New And Useful DNA Fractions That Do Not Exist In Nature, Not A Natural Phenomenon**

Directly on point here is the Federal Circuit's decision in *Rapid Litigation Management Ltd. v. CellzDirect Inc.*, 827 F. 3d 1042 (Fed. Cir. 2016).   In *CellzDirect*, the patent covered a technique for preserving certain liver cells (known as hepatocytes) for later use.   The prior art approach was to simply freeze the liver cells and then thaw them when they needed to be used. *Id.* at 1045.   This approach, however, damaged the liver cells and led to poor recovery of viable cells. *Id.*   The use of multiple freeze-thaw cycles was deemed unworkable for key applications. *Id.*

The inventors in *CellzDirect*, however, made the surprising discovery that certain liver cells naturally possessed the quality of being able to survive multiple freeze-thaw cycles.   Having made this discovery, the inventors developed an improved process of preserving liver cells.   This process required subjecting previously frozen and thawed cells to a process that separates viable cells from non-viable ones.   The viable cells were recovered, and refrozen for later use. *Id.*   The claims in *CellzDirect* specified "that the resulting hepatocyte preparation can be thawed and used immediately, exhibiting 70% viability after the second thaw." *Id.*

The Federal Circuit rejected the contention that the claims in *CellzDirect* were simply directed to the natural law that certain liver cells could survive multiple freeze-thaw cycles:

> It is enough in this case to recognize that the claims are simply not directed to the ability of hepatocytes to survive multiple freeze-thaw cycles.   Rather, the claims of the '929 patent are directed to a new and useful laboratory technique for preserving hepatocytes.   This type of constructive process, carried out by an artisan to achieve "a new and useful end," is precisely the type of claim that is eligible for patenting.   The inventors certainly discovered the cells' ability to survive multiple freeze-thaw cycles, but that is not where they stopped, nor is it what they patented. ***Rather, "as the first party with knowledge of" the cells' ability, they were "in an excellent position to claim applications of that knowledge."   That is precisely what they did. They employed their natural discovery to create a new and improved way of preserving hepatocyte cells for later use.***

*Id.* at 1048 (citations omitted).

1   This guidance is directly applicable here.  Just as the claims in *CellzDirect* were not directed to

2   a composition of liver cells or the natural phenomenon that certain liver cells can survive multiple

3   freeze thaw cycles, the claims of the '751 and '931 patents are not directed to a composition of DNA

4   or the natural phenomenon that the fetal cell-free DNA is on average smaller than maternal cell-free

5   DNA.  Rather, just like the claims in *CellzDirect* were directed to a process that yields a non-natural

6   composition of cells enriched for those that can survive freeze-thaw cycles, the claims of the '751 and

7   '931 patents are directed to process that yields a non-natural composition of cell-free DNA fragments

8   that is enriched for fetal DNA.  And just as the new composition of liver cells in *CellzDirect* offered

9   "new and useful" utility, so too do the enriched compositions of cell-free DNA generated through the

10  techniques of the '751 and '931 patents.  In particular, the claimed techniques allow one to use cell-

11  free DNA from a pregnant woman to determine fetal genetic traits with improved signal-to-noise.  *See*

12  *supra* pp. 5-6.  Accordingly, just like the invention in *CellzDirect*, the processes claimed in the '751

13  and '931 patents are not "directed to" a natural phenomenon and are precisely the type of inventions

14  eligible for patenting.

15          2.      **Defendants' Contentions That The Claims Are Directed To A Natural**
                   **Phenomenon Are Legally And Factually Erroneous**
16

17          Defendants make two main arguments in support of their contention that the claims of the '751

18  and '931 patents are directed to a natural phenomenon.  First, Defendants argue that the claims "begin

19  and end" with the natural phenomenon that fetal cell-free is smaller on average than maternal cell-free

20  DNA.  See Dkt. No. 48 at 1-2.  Second, Defendants argue that the claims are directed to "nothing

21  more" than the observation or detection of this natural phenomenon.  Both arguments are without

22  merit.

23                  a)      **The Claims Do Not "Begin And End" With A Natural Phenomenon**

24          Citing the *Ariosa* case, Defendants assert that "claimed method begins with a sample of cell-

25  free DNA and ends with an analysis of it.  Because the claimed method begins and ends with naturally

26  occurring material, it is directed to patent ineligible subject matter."  Dkt. No. 48 at 8.  This argument,

27  however, is based on both legal and factual error.

28

At the outset, Defendants' gloss over a fundamental aspect of the claim language.  Specifically, while Defendants assert that the "claimed method begins and ends with naturally occurring material," the claims are not directed to a "material" at all.  Rather, the claims are directed to a ***method*** for preparing a non-natural composition of DNA, not the DNA itself.  Even though the substances from which the resulting non-natural composition is made up of might exist in nature, it is black letter law that novel techniques for preparing new compositions from nature are not ineligible for patenting.  *See, e.g.*, *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 596 (2013) (explaining that an innovative method of manipulating a natural phenomenon would be patentable, e.g., "[a] method of manipulating genes while searching for the BRCA1 and BRCA2 genes"); *Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd.*, 887 F.3d 1117, 1136 (Fed. Cir. 2018) (explaining that claims directed to a process involving genotyping were patent eligible because they "[did] not claim naturally occurring DNA segments" themselves; emphasizing that "method claims" and "patents on new applications of knowledge about [particular] genes" were "not implicated by [the Myriad] decision.").

Again, the *CellzDirect* case vividly illustrates the point.  Specifically, in describing the relationship between the liver cells and the claims, the Federal Circuit held that "regardless of whether the individual hepatocytes in the pool of multi-cryopreserved hepatocytes have the same effect they always had or perform in their natural way, ***the claims are directed to a new and useful process of creating that pool, not to the pool itself***."  *Id.* at 1049.  Thus, as *CellzDirect* teaches, even though the fetal DNA that is enriched through the processes claimed in the '751 and '931 patents is not itself changed, the claims of the '751 and '931 patents are nonetheless patent-eligible because they are directed to a new and useful process of preparing the DNA rather than the DNA itself.

Defendants recognize that the *CellzDirect* case is highly relevant, and thus attempt to preemptively soften its impact in their opening brief.  But Defendants' proposed distinction over *CellzDirect* is artificial and, on the contrary, proves that the claims of the '751 and '931 patents are eligible under § 101.  In particular, Defendants argue that the claims in *CellzDirect* were eligible under § 101 because freeze-thaw cycles do not occur in nature:

> The claims in *CellzDirect* do not "begin and end" with a natural phenomenon.
> Hepatocytes are not frozen and thawed in nature (at least not unless their host is also

1  frozen and thawed, which would presumably give rise to other problems). The claims

2  end with a specific cryopreservation step, which also does not occur in nature.

3  Dkt. No. 48 at 9.  Yet, just as liver cells are not frozen and thawed in nature, cell-free DNA is not

4  naturally subject to a size-selection process based on a 500 base pair or 300 base pair human selected

5  parameter.  Likewise, just as liver cells are not subject to cryopreservation in nature, cell-free DNA is

6  not naturally subject to an analysis step to determine fetal genetic traits.  If, as Defendants properly

7  acknowledge, the claims in *CellzDirect* are eligible under § 101 because they include steps that do not

8  occur in nature, then they must also acknowledge that claims of the '751 and '931 patents are also

9  patent eligible.

10      In this regard, the fact that the claims recite the use of a 300 base pair or 500 base pair

11  parameter is particularly noteworthy.   There is nothing natural about the application of such a

12  parameter to cell-free DNA, nor is there anything to suggest that it was routinely or conventionally

13  done.



22  Ex. 3 [Stokowski] at 164:6-21 (objections omitted).

23      Such testimony confirms that the processes set forth in the '751 and '931 patents do not "begin

24  and end" with a natural phenomenon, but instead pertain to processes based on human ingenuity and

25  scientific judgment that are undoubtedly eligible for patenting.  In this regard, the claims of the '751

26  and '931 patents are nothing like the claims in *Ariosa*, which involved nothing but routine and

27  conventional steps that were applied in a traditional way with no exercise of discretion or judgment

28  and no regard for context.  Patents are not invalid when they are based on the application of scientific

1  principles with human ingenuity in a context-dependent way.  *See, e.g.*, *Diamond v. Diehr*, 450 US

2  175, 187 (1981) ("It is now commonplace that an ***application*** of a law of nature or mathematical

3  formula to a known structure or process may well be deserving of patent protection.") (emphasis in

4  original).

5      Ultimately, Defendants' argument that the claims "begin and end" with a natural phenomenon

6  is based on the notion that the claims are fatally infected because a natural phenomenon underlies the

7  claims.   The tenor of Defendants' brief is that the inventors should be penalized because they

8  attempted to claim a practical application of their discovery.  Defendants even argue that Plaintiffs

9  have made some sort of "concession" by acknowledging that the invention "relates" to a natural

10  phenomenon.  *See* Dkt. No. 48 at 6 ("Plaintiffs ***concede*** that the claimed methods relate to the

11  supposed discovery of 'the relative size distribution of fetal and maternal DNA'").   This cynical

12  argument goes against the grain of how the patent system is intended to work and is contrary to law.

13     The Supreme Court has explained that someone who first discovers a phenomenon is in

14  "excellent position to claim applications of that knowledge."  *Ass'n for Molecular Pathology v.*

15  *Myriad*, 133 S. Ct. 2107, 2120 (2013).   Consistent with this, the Federal Circuit has explained that

16  inventions are not ineligible because a natural phenomenon underlies them.   To be ineligible, the

17  claims must be "directed to" the natural phenomenon:

18      ***At step one, therefore, it is not enough to merely identify a patent-ineligible concept***
       ***underlying the claim***; we must determine whether that patent-ineligible concept is what
19      the claim is "directed to." Here, the plain claim language shows that it is not. The '929
       patent does not simply claim hepatocytes' ability to survive multiple freeze-thaw cycles.
20      The '929 patent instead claims a "method of producing a desired preparation of multi-
       cryopreserved hepatocytes." ***This new and improved technique, for producing a***
21      ***tangible and useful result, falls squarely outside those categories of inventions that***
       ***are "directed to" patent-ineligible concepts***.
22

23  *CellzDirect*, 827 F.3d at 1050.  Defendants' approach to § 101 is precisely the type that the Federal

24  Circuit has warned against because it would lead to the invalidation of scores of useful inventions.  *See*

25  *id.* at 1049 ("If that were so, we would find patent-ineligible methods of, say, producing a new

26  compound (as directed to the individual components' ability to combine to form the new compound),

27  treating cancer with chemotherapy (as directed to cancer cells' inability to survive chemotherapy), or

28  treating headaches with aspirin (as directed to the human body's natural response to aspirin).").

1

2

           **b)**    **The Claims Are Directed To More Than Just Observing Or Detecting A Natural Phenomenon**

3

4

5

6

7

8

9

        Defendants' second argument is that the claims are directed to nothing more than "observation" or "detection" of a natural phenomenon.  As Defendants argue, the "inventors sought a patent directed to the supposed discovery 'that in maternal blood plasma the distribution based on fragment size is different for maternal DNA and fetal DNA.'" Dkt. No. 48 at 3.  Defendants contend that the claims are directed to "nothing more" than "detection" of this natural phenomenon.  *See id.* at 10 (The "asserted claims…focus on the detection of a particular size of DNA—a natural phenomenon and nothing more.").

10

11

12

13

14

        Such arguments, however, distort the claims to improperly analogize them to the claims in cases Defendants wish to rely upon, in particular the claims in the *Genetic Technologies* and *Ariosa* cases.  The claims of the '751 and '931 patents, however, are nothing like the claims in *Genetic Technologies* and *Ariosa*.  In those cases, the claims were ***expressly*** directed to nothing more than "detection" of a natural phenomenon.

15

16

17

18

19

20

        In *Genetic Technologies*, the claim recited methods for detecting a coding region of DNA based on its relationship to non-coding regions.  *Genetic Techs., Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373-74 (Fed. Cir. 2016).  The claims expressly recited a "method for ***detection*** of at least one coding region allele." *Id.* at 1372.  Because the relationship between coding and non-coding sequences was a law of nature, the claim amounted to nothing other than identifying "information about a patient's natural genetic makeup." *Id.* at 1375.[2]

21

22

23

        Likewise in *Ariosa*, the claims recited methods for detecting paternally inherited cell-free fetal DNA.  *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1373-74 (Fed. Cir. 2015).  The

24

25

26

27

28

---

[2] Defendants further cite the unpublished decision *23andme, Inc. v. Ancestry.com DNA, LLC*, Case No. 18-cv-02791 (N.D. Cal. Aug. 23, 2018), ECF No. 51.  The key claims in this case, however, were indistinguishable from those in *Genetic Technologies*, "which focused on the observation and comparison of DNA sequences – occurrences in nature."  *Id.* at 16.  In particular, the claims were directed to nothing more than "***detecting*** a relative relationship based on DNA patterns which occur in nature." *Id.* at 16-17.  As documented above, the claims of the '751 and '931 patents are not directed to detecting the natural phenomenon regarding the size distribution of fetal cell-free DNA, but rather a process for preparing a new and useful DNA fraction.

---

1  claim expressly recited a "method for ***detecting*** a paternally inherited nucleic acid."  *Id.* at 1373.  As

2  the Federal Circuit explained, the "existence and location of cffDNA is a natural phenomenon;

3  identifying its presence was merely claiming the natural phenomena itself."  *CellzDirect*, 827 F.3d at

4  1048 (citing *Ariosa*, 88 F.3d at 1376).

5  　　　　Unlike the claims in *Genetic Technologies* and *Ariosa*, the claims of the '751 and '931 patents

6  include no steps directed to "detecting" or "observing" any natural phenomenon, including the

7  phenomenon that fetal DNA is smaller than maternal DNA.  Quite the contrary, the claims are directed

8  to preparing a non-natural DNA fraction enriched for fetal DNA.  Claim 1 of the '751 patent even

9  expressly states that it is a "method for preparing a deoxyribonucleic acid (DNA) fraction from a

10  pregnant human female useful for analyzing a genetic locus involved in a fetal chromosomal

11  aberration[.]"  *See* Dkt. No. 48-2 at claim 1.  It is undisputed that if one simply carried out the claimed

12  methods one would ***not*** detect or observe that the fetal cell-free DNA is smaller on average than

13  maternal DNA.  Although one will have a non-naturally occurring fraction of DNA consisting of

14  smaller DNA fragments, one will have no knowledge as to whether this DNA is enriched for fetal

15  DNA.  This is because the claims are directed to an ***application*** of a natural phenomenon, not the

16  natural phenomenon itself.　　Defendants' reliance on *Genetic Technologies* and *Ariosa* is thus

17  unpersuasive.

18  　　　　The *CellzDirect* case is again instructive.  There, the claimed technique for preparing the

19  improved composition of liver cells was "not simply an observation or detection of the ability of

20  hepatocytes to survive multiple freeze-thaw cycles."  *CellzDirect*, 827 F.3d at 1048.  Rather, the claims

21  were "directed to a new and useful method of preserving hepatocyte cells.  Indeed, the claims recite a

22  '***method of producing*** a desired preparation of multi-cryopreserved hepatocytes.'"  *Id.* (emphasis in

23  original).  Just as in *CellzDirect*, the claims of the '751 and '931 patents expressly recite a method for

24  preparing a new cell-free DNA composition, and are not "simply an observation" that fetal cell-free

25  DNA tends to be smaller than maternal cell-free DNA.

26  　　　　Notably, if, as Defendants contend, the claims of the '751 and '931 patents were truly directed

27  to "nothing more" than detection of this natural phenomenon, one would have expected Defendants to

28  argue strenuously that the claims improperly preempted the natural phenomenon.  Yet, Defendants

1   present no such argument. In fact, their own 30(b)(6) witness acknowledged ███████████

2   ████████████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████

5   ███████████████████████

6       ██████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████████

12  █████████████████████████████ The fact that there are ways of exploiting the natural

13  phenomenon without using the claimed invention is yet further confirmation that the claims are not

14  merely directed to observation of a natural phenomenon.

15      **B.    Defendants Cannot Show That There Is No Disputed Issue Of Fact Under *Alice*
16            Step Two**

17      As documented above, the '751 and '931 patents are not directed to a natural phenomenon, and

18  Defendants' motion should be denied for this reason alone. Defendants' motion should be denied for

19  the further reason that it has not come close to establishing that there is no disputed issue as to whether

20  the claims include an inventive concept under *Alice* step two.

21      Defendants present no particularized analysis regarding whether the claims of the '751 and

22  '931 patents include an "inventive concept" under *Alice* step two. Rather than consider the claims as a

23  whole, in reductio ad absurdum manner, Defendants deconstruct the claims into their individual

24  elements and argue that these elements are not by themselves novel. This approach is legally

25  erroneous. Moreover, the evidence establishes that the steps recited in the claims were not remotely

26  routine, conventional, or well-known, a point that becomes clear when the claims are considered as a

27  whole.

28

## 1.      Defendants' Deconstructive Approach Fails As A Matter Of Law

When analyzing a claim for an "inventive concept" under *Alice* step two, the relevant inquiry is whether the claim includes "some element or combination of elements sufficient to ensure that the claim in practice amounts to 'significantly more' than a patent on an ineligible concept."   *DDR Holdings, LLC v. Hotels.com*, L.P., 773 F.3d 1245, 1255 (Fed. Cir. 2014).  The notion that the claims of the '751 and '931 patents do not satisfy this standard is belied by Defendants' own brief, which acknowledges that the claims include at least three undisputedly non-natural laboratory steps (i.e., first step: "extracting DNA," second step: "size separation of the DNA," and final step: "analysis of the resulting fraction").  *See* Dkt. No. 48 at 4, 10.  As documented above, one of these steps involves a human-selected parameter that is based on judgment and ingenuity.  *See supra* Part IV.A.2.a).  With such non-natural steps present in the claims, any suggestion they do not amount to "significantly more" than a natural phenomenon is dubious at best.

To try and overcome this challenge, Defendants deconstruct the claims into their individual steps and assess them in isolation from one another.  *See, e.g.*, Dkt. No. 48 at 4, 10.  According to Defendants, these steps cannot contribute to patent eligibility because none of them individually confer "novelty."  *See, e.g.*, *id.* at 4 ("The common specification of the asserted patents does not identify any supposed *novelty* in any of the steps of any of the techniques used to perform them."); *id.* at 2 ("Nothing in the specification or the prosecution histories of the '751 and '931 patents identifies any *novelty* or inventiveness in any of those steps beyond the natural phenomenon itself."); *id.* at 4 ("The patent specification ascribes no *novelty* to any of these techniques."); *id.* ("Again, the patents ascribe no *novelty* to these techniques."); *id.* at 10 ("The applicants identified nothing *novel* about the techniques that they used to identify and detect the natural phenomenon.").  Defendants' argument is without merit for two key reasons.

First, in the context of § 101, Defendants cannot show that the claims of the '751 and '931 patents are ineligible under § 101 by arguing that claim elements do not rise to the level of conferring "novelty."  To meet their burden of showing that the claim elements do not add enough beyond a natural phenomenon to confer eligibility, Defendants must make the much more stringent showing that the claim elements are so highly established in the art that they are "well-understood, routine, and

conventional." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018); *Aatrix*, 882 F.3d at 1129. Although Defendants give lip service to this standard in their brief, they lapse to the lowered "novelty" standard because there is insufficient evidence of record to support summary judgment under the correct legal standard.  *See infra* Part IV.B.2.

Second, Defendants' technique of parsing the claims and arguing that each of the steps individually fail to confer "novelty" cannot succeed because the § 101 inquiry must consider the claims' character "as a whole."  *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016).   The Supreme Court has held that a claim cannot be proven obvious under § 103 simply by showing that each element of a claim is "independently" known in the art.  *See KSR Intern. Co. v. Teleflex Inc.*, 550 US 398 (2007).  The exact same thing is true with regard to section 101.  Even where a claim is composed entirely of "generic" steps, it is nonetheless eligible for patenting if the combination supplies an inventive concept:

> We agree with the district court that the limitations of the claims, taken individually, recite generic computer, network and Internet components, none of which is inventive by itself. BASCOM does not assert that it invented local computers, ISP servers, networks, network accounts, or filtering. Nor does the specification describe those elements as inventive.
>
> However, we disagree with the district court's analysis of the ordered combination of limitations. In light of *Mayo* and *Alice*, it is of course now standard for a § 101 inquiry to consider whether various claim elements simply recite "well-understood, routine, conventional activit[ies]." ***The district court's analysis in this case, however, looks similar to an obviousness analysis under 35 U.S.C. § 103, except lacking an explanation of a reason to combine the limitations as claimed. The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art. As is the case here, an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces.***

*Bascom*, 827 F.3d at 1349–50 (citation omitted).

The *CellzDirect* case is again directly on point.  In *CellzDirect*, the individual claim steps involved simply freezing and thawing.  Nothing could be more routine, conventional, or well-known than this.  Yet, as the Federal Circuit held, the claims were patent eligible because the overall process was not routine and conventional: "Here, the claimed process involves freezing and thawing hepatocytes twice. The individual steps of freezing and thawing were well known, but a process of preserving hepatocytes by repeating those steps was itself far from routine and conventional."

1    *CellzDirect*, 827 F.3d at 1051; *see also id.* ("That each of the claims' individual steps (freezing,

2    thawing, and separating) were known independently in the art does not make the claim unpatentable.").

3            **2.    Defendants Have Not Shown That The Claimed Combination Of Steps Is
                     Routine, Conventional, Or Well-Known**

4

5            Where claims do not broadly preempt related technologies, do not merely combine components

6    in a generic manner, and provide a particular solution to a problem in the art, an inventive concept is

7    likely to exist.  *See Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F. 3d 1288, 1301 (Fed. Cir.

8    2016) (*Alice* step two satisfied where claim "narrowly drawn to not preempt any and all generic

9    enhancement of data in a similar system, and does not merely combine the components in a generic

10   manner, but instead purposefully arranges the components in a distributed architecture to achieve a

11   technological solution to a technological problem specific to computer networks"); *see also Bascom*,

12   827 F.3d at 1350 ("Nor do the claims preempt all ways of filtering content on the Internet; rather, they

13   recite a specific, discrete implementation of the abstract idea of filtering content.").

14           All of these indicia are present here.  Just like the claims in *CellzDirect*, the claims of the '751

15   and '931 patents, when considered as a whole, cover an innovation in the field of cell-free DNA

16   analysis based on a particular and unconventional combination of concrete laboratory techniques.  The

17   claimed process yields a non-natural composition of DNA with an increased fraction of fetal DNA.

18   Use of this composition can reduce the noise, bias, and distortion associated with prior art methods.

19   And, as documented above, Defendants do not suggest in the slightest that there is any preemption

20   issue.  Accordingly, an inventive concept is present.

21           During prosecution the foregoing issues were considered at length, and the patentees submitted

22   expert witness testimony from Dr. Mathias Ehrich confirming the indicia of an inventive concept.  In

23   particular Ehrich testified as follows:

24           •    "Although fetal and maternal DNA fragments in maternal blood plasma differ in
                  size and there are fragments present that are less than 500 base pairs, the DNA
25                in maternal blood plasma is not the size discriminated fraction produced by the
                  claimed methods.  Dkt. No. 48-3 [Ehrich Decl.] ¶ 20.
26

27           •    "The claimed methods do not start and end with a natural phenomenon. The
                  claimed methods result in mixtures of fetal and maternal DNA that are ***not
28                found in nature*** and were obtained by the inventors exploiting a previously

---

unknown size distribution difference between fetal and maternal DNA in a particular way." *Id.*

• "However, after the DNA in maternal blood plasma is subject to size discrimination as in the claimed methods this ratio changes and has a new value that ***does not exist in nature***." *Id.*

• "The claimed methods represent a ***significant advancement*** in the field by enabling the use of fetal DNA for the analysis of more complex fetal genetic loci to determine the presence or absence of a fetal chromosomal aneuploidy." *Id.*

The Examiner agreed with this testimony, which is the only expert opinion of record in the case.  *See, e.g.,* Ex. 2 [6/2/2017 NOA] (The "application of the practical steps of the claimed methods to the particular sample required of the claimed methods was not routine and conventional in the art."). Defendants, for their part, submit no testimony to rebut it.   Rather, Defendants simply ask the Court to take their word that the claimed combination of steps in the '751 and '931 patents is so routine, conventional, and well-known that they are ineligible for patenting.

Unlike the *Ariosa* case relied upon so heavily by Defendants, however, this is not a situation where the claim steps involved nothing but routine processes that are carried out in a context-independent manner.  Defendants' assumption to the contrary is particularly unwarranted in view of the testimony of their 30(b)(6) witness, who ███████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████ Ex. 3 [Stokowski] at 116:9-23.  As she explained, ████████████████████ ███████████████████████████████████████████████████████████████████ ███████ *Id.* at 117:11-14.  As to techniques for enriching a cell-free DNA sample for fetal DNA, Defendants' witness confirmed that ████████████████████████████████████████████ ███████████████████ ██ ██████████████████████████████████████████████████ ██ ███████████████████████████████████████████████████████ ██ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

1

2

3        As Defendants' witness explained,

4

5

6   *Id*. at 132:13-18. Later,

7

8        Viewing this evidence in the light most favorable to Plaintiffs,

9   there remains a genuine issue of fact as to whether the claimed methods include steps that are so well-

10  understood, conventional, and routine such that they do not confer patent eligibility.

11       Taking into consideration the dependent claims further confirms that the claims are not directed

12  to processes that were routine, conventional, or well-understood.  For instance, claim 11 of the '931

13  patent requires the use of microarrays.

14

15

16

17

18

19       . With no methodology available whatsoever, such an approach cannot possibly be well-

20  understood, routine, and conventional.

21       As another example, claims 9 and 10 of the '751 patent and claims 13 and 14 of the '931 patent

22  recite either that the "fetal chromosomal aberration is an aneuploidy" or that the "fetal chromosomal

23  aberration causes Down's Syndrome."  Defendants present no evidence to establish that this would

24  have been well-understood, routine, and conventional in the 2003 time frame.  At most, Defendants

25  assert that aneuploidy and Down's syndrome are natural phenomena, so a method for assessing these

26  aberrations based on analysis of a size-selected DNA fraction cannot be patent eligible.  *See* Dkt. No.

27  48 at 13.  This makes no sense, and is unsupported by the evidence.  The patents themselves explain

28  assessment of aneuploidy was "problematic" and that the limited amount of fetal DNA rendered it

1   "difficult, if not impossible" to assess aneuploidy.   *See* Dkt. No. 48-2 at 1:35-50.   Likewise,

2   Defendants' own 30(b)(6) witness █████████████████████████████████████████

3   ████████████████████████████████████   As noted above, she confirmed that in 2003,

4   ██████████████████████████████████████████████   The notion that detection

5   of aneuploidy was routine, conventional, and well-understood is without basis and Defendants cannot

6   meet their burden on summary judgment.

7   **V.       CONCLUSION**

8           For the foregoing reasons, Defendants' motion for summary judgment should be denied.

9

10  DATED:  December 5, 2018                        submitted,

11                                                 WEIL, GOTSHAL & MANGES LLP

12                                                 By:  */s/ Edward R. Reines*

13                                                      Edward R. Reines

14                                                 Attorneys for Plaintiffs/Counterclaim-Defendants,
                                                   ILLUMINA, INC. and SEQUENOM, INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28